# STATE OF FLORIDA, DEPARTMENT OF COMMUNITY AFFAIRS v STELLA NEVILLE, INC., et al.

## Case No. 85-3674

State of Florida, Division of Administrative Hearings

September 5, 1986

### APPEARANCES OF COUNSEL

**C. Lawrence Keesey** and **Ross Burnaman,** Department of Community Affairs, for petitioner.

**Michael Egan, Roberts, Egan & Routa, P.A.,** for respondent, Stella Neville, Inc.

**Calvin Allen,** Assistant County Attorney, for respondent, Board of County Commissioners of Monroe County.

### OPINION

WILLIAM J. KENDRICK, Hearing Officer.

## RECOMMENDED ORDER

Pursuant to notice, the Division of Administrative Hearings, by its duly designated Hearing Officer, William J. Kendrick, held a public hearing in the above-styled cause on March 31-April 1, 1986, in Key Largo, Florida.

## PRELIMINARY STATEMENT

This is an appeal, pursuant to Section 380.07, *Florida Statutes*, to the Florida Land and Water Adjudicatory Commission (Adjudicatory Commission) from a development order of the Monroe County Board of County Commissioners (Monroe County) granting the application of Stella Neville, Inc. (Neville) for a permit to conduct excavation and mining activities on north Key Largo, Monroe County, Florida. The Adjudicatory Commission forwarded the Department of Community Affair's (Department's) appeal to the Division of Administrative Hearings, and requested the assignment of a Hearing Officer to conduct a hearing pursuant to Section 120.57(1), *Florida Statutes*.

At final hearing, Neville called as witnesses: Jim Santi; Kenneth Schang, accepted as an expert on environmental engineering; and Earl Rich, accepted as an expert on ecology. Neville offered Exhibit 1-3, and they were received into evidence. The Department called as witnesses: Kenneth Schang; Robert Smith, accepted as an expert on biology and Upper Keys ecology; Annette Nielsen, accepted as an expert on biology and Florida Keys ecology; and, Jeffrey Schaeffer, accepted as an expert on zoology and ecology. The Department offered Exhibits 1-9, and Exhibits 3 and 9 were received into evidence. The parties' joint Exhibits 1-11, were received into evidence.

The transcript of hearing was filed May 22, 1986, and the parties were granted leave through June 13, 1986, within which to submit proposed findings of fact and conclusions of law. The Department, Neville, and Monroe County[1] have submitted proposed findings, and they have been addressed in the appendix to this Recommended Order.

## FINDINGS OF FACT

1. Stella Neville, Inc. (Neville) is the owner of a 4.5 acre tract of land which abuts State Road (SR) 905 on north Key Largo, Monroe County, Florida. On June 21, 1985, Monroe County entered a development order approving Neville's amended permit application to excavate and mine coral rock from its property. The Department, pursuant to

---

[1] Monroe County adopted, as its own, the proposed findings submitted on behalf of Neville.

Section 380.07, *Florida Statutes*, filed a timely appeal with the Adjudicatory Commission.

*The Subject Property*:

2. The Neville property is located in that portion of Monroe County designed as an area of critical state concern, Section 380.0552, *Florida Statutes*, and is part of a tropical hardwood hammock which extends several miles north and a substantial distance south on either side of SR 905. To the immediate east, south and west of the Neville property, however, there has been some man-induced alteration of the topography.

3. The Neville site is bounded on the east by SR 905[2] ; on the southwest by a 9-acre tract owned by Keystone Products, Inc. (Keystone), which is currently being quarried for coral rock; and to the west by a 60-acre tract of land, known as the "West Cappeletti Pit", which contains a large abandoned borrow pit dug to depths of up to 60 feet. With the exception of the West Cappeletti Pit and the Keystone quarry, the area west of US 905 stands predominately undisturbed by humans.

4. About 1970, however, the Neville property was disturbed by fire. Consequently, the tropical hardwood hammock community is presently characteristic of a successional hammock, as opposed to a mature hammock, with a dense understory of immature trees.[3] On site vegetation includes: Jamaica Dogwood, Gumbo Limbo, Poisonwood, Spanish Stomper, Wild Lime, Bamboo, Lancewood, Crabwood, and Mahogany.

5. While the successional hammock, which occupies the Neville site, may not be considered as rare or unique because it has not yet reached maturity, it does provide needed habitat for the fauna of the area. The Key Largo Woodrat, an endangered species, inhabits the Neville site notwithstanding its preference for mature hardwood hammocks. Several active Key Largo Woodrat stick nests have been located on the site; with one located approximately 125 feet from the proposed quarry area. The site also provides habitat for the indigo snake, a threatened species, observed on site.

*The Neville Application*:

6. Neville's revised application, dated February 27, 1985, sought

---

[2] The Neville site is located on SR 904 north of its intersection with US Highway 1. East of the Neville site, across SR 905, are three subdivisions which extend from SR 905 to the Atlantic Ocean.

[3] *It takes approximately 50 years for a hardwood hammock to reach maturity.*

226

authorization from Monroe County to mine coral rock from the westerly 1.6 acres of its 4.5-acre tract to create a lake.[4] Neville proposed to mine the rock to a depth of -10' MLW (mean low water) by use of a trenching machine capable of cutting block 3' square and 8' deep; no dynamiting would be necessary under Neville's proposal. At hearing, Neville agreed to limit the depth of its excavation to -8' MLW to ensure good sunlight penetration and, consequently, good water quality.

7. The quarry proposed by Neville would measure 300' x 232'; contain a safety shelf 3' wide around the perimeter of the quarry at a depth of -1' MLW; and be bermed to a height of 1' above grade to prevent storm water runoff from entering the quarry's waters. Dug as proposed, the quarry would result in the removal of 39,000 cubic yards of coral rock.

8. Neville does not, itself, propose to mine the property. Neville's application was filed by its "agent" Keystone, which is currently mining the property which abuts Nevilles'. Keystone, as lessee, proposes to cut the blocks from the Neville site and truck them to its plant in Florida City where they would be custom cut to provide a coral rock veneer construction material.

*Monroe County's Approval:*

9. At a regular meeting of the Monroe County Board of County Commissioners on June 21, 1985, Monroe County approved Neville's revised application conditioned upon:

> . . . the full restoration of the property as outlined; that at the time of the restoration period, the County would be contacted and have the option of using this as a site for disposal of materials; that bonding of half the amount of the value of the fill that it would take to fill in the excavation site would be required; that the site would be mined in such a way that the second half of the proposed mine could not be mined until the first half was restored; that all endangered species taking permits or other State or Federal permits would be had before this was allowed to proceed; and that no more

---

[4] Neville's original application, dated June 8, 1984, sought authorization to excavate a lake of 1.6 acres to create 10 water front lots, and to remove all trees and shrubs in the area of the proposed lake. Under Neville's original application, the lake (quarry) was to have been located along the northern boundary of the property, with the proposed lots along SR 905 and the property's southern boundary. Upon the advice of Neville's consultant, the proposed lake was moved to the western portion of the site to "reduce its impact" on the Key Largo Woodrat. Neville's revised application, as with its original application, still proposed the creation of a lake; however, its revised application was silent as to any future use it intended of the remainder of its property.

than three years after completion of the excavation, the site will be totally restored or the bond will be forfeited.[5]

*Areas of Concern*:

10. The Department's appeal charged that the proposed project was a non-permitted use under Monroe County's GU-general use district, Section 19-180 *Monroe County Code (MCC)*; that the permitting of the subject mine was contrary to Section 19-111(b), *MCC*, Excavation and Mining Activities, because of the alteration of hydrologic regime, violation of water quality standards, destruction of tropical hardwood hammock, and disturbance of endangered species; that the proposed project was contrary to Sections 18-18, 18-19, 18-21, and 18-23, *MCC*, because no land clearing permit was received and the project would adversely impact natural resources, scenic amenities, water quality, and tropical hardwood hammock; and, that the proposed project was contrary to the Monroe County Comprehensive Plan, Coastal Zone Protection and Conservation Element, Chapter 4, because it failed to minimize the destruction of natural vegetation or to demonstrate special protective efforts for endangered species.

11. Notwithstanding the Department's charges, no party offered any part of the Monroe County Code or the Monroe County Comprehensive Plan in evidence. Therefore, only those portions of the Monroe County Code contained in paragraphs 7-9 of the Department's petition, which were admitted by Neville, are a part of the record in this case.

12. The Neville property is zoned GU-general use. Section 19-180, *MCC*, provides:

(a) No land, body of water and/or no structure shall be used or permitted to be used, . . . in any zone of classification GU-general, which is designated, arranged or intended to be used or occupied for any purpose, except for one or more of the following uses, unless otherwise provided:

(1) Single family dwellings with their customary accessory uses.

(2) Agriculture uses.

(3) Clubs, including country, golf, gun and fish clubs or similar enterprises, and ranges.

(4) Athletic fields and stadiums.

---

[5] Whether the full restoration of the property was required by Monroe County contemplated the revegetation of the mined area is not apparent from the record in this case. It is clear, however, that the revegetation plan proposed by Neville at hearing was not presented to Monroe County since it was only developed within 30 days of hearing. Neville is, however, amenable to the conditions imposed by Monroe County.

(5) Power plants and sub-stations, water pumping stations, television, and radio transmission towers.

(6) Fishing camps on isolated islands.

(7) Churches (two (2) acres).

(8) Horses: Horses may be kept only in a GU zone, on a minimum of one (1) acre. The area must be fenced, properly drained and if a stable or other structure exists on the property it must meet all the building and setback regulations of Monroe County.

(9) Cemeteries, including crematories and mausoleums on a minimum of five (5) acres.

An area of land set apart for the sole purpose of the interment of the remains of deceased persons and for the erection of customary markets [markers], monuments, and mausoleums.

(10) Monuments recognizing persons or points of historical interest (two (2) acres).

And, Section 19-109, *MCC*, Interpretation of Permitted Uses, provides:

In the administration and enforcement of this ordinance all uses not expressly permitted in any district are otherwise prohibited.

13. Neville argues that simply because its property is zoned GU does not preclude issuance of the subject permit because excavation and mining activities within Monroe County are not restricted by zoning classification. To support its position, Neville asserts that the provisions of the Monroe County Code which establish the criteria for evaluating applications for excavation and mining permits do not require any specific zoning category, and that Monroe County has interpreted its code to allow excavation and mining activities in all zoning classifications. The record does not support Neville's assertion.

14. The only part of the Monroe County Code dealing with excavation and mining permits of record in this proceeding is the following portion of Section 19-111, *MCC*:

(b) Excavation and Mining Activities

. . . . . . . . . . .

(2) Upland permit application. *Application for a permit to excavate within upland areas, as defined above,* with a proposed volume greater than one thousand (1,000) cubic yards shall be approved or denied by the board of county commissioners. . . . Consideration will be given to the county staff's comments and reports which will account for the effects to the natural biological functions and

communities within the proposed site, and to the physical aspects of drainage and water quality within the proposed area of excavation.

(3) Mining permit application. Applications for a permit to conduct mining operations within Monroe County shall adhere to the following:

. . . . . . . . . . .

(b) A topographic map of the area signed by a professional engineer or land surveyor shall be submitted. (Emphasis added)

From the foregoing provision, the conclusion cannot be drawn that excavation and mining activities may be permitted without regard for the zoning classification of the property.

15. The only evidence of record that Monroe County may interpret its code as permitting excavation and mining activities in a GU-zone is the fact that the properties encompassed by the West Cappeletti Pit and the Keystone quarry are currently zoned GU.[6] There is no evidence, however, which would demonstrate when those activities were permitted and what zoning ordinances or classifications were in effect when permitted. Accordingly, the existence of such quarries does not support Neville's contention.

16. With the exception of the matters discussed in paragraphs 14 and 15, *supra*, Neville presented no evidence that Monroe County permitted mining and excavation in any zoning category or that Monroe County interpreted its code to permit such activities. Based on the evidence presented, Neville has failed to establish that its proposed mining and excavation activity is consistent with the land development regulations applicable to this case.

17. In light of the foregoing conclusion, it is unnecessary to pass upon the impacts of the proposed project on the area's hydrologic regime, water quality, tropical hardwood hammocks, endangered species, or to evaluate Neville's mitigation proposals.

### CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the parties to, and the subject of, these proceedings.

2. This is an appeal, pursuant to Section 380.07, *Florida Statutes*, from a development order of Monroe County granting Neville's application to excavate and mine in an area of critical State concern. Pursuant to the provisions of Section 120.57(1), *Florida Statutes*, a *de*

---

[6] Joint Exhibit 9 is a zoning map, *published October 1984*, which shows the West Cappeletti Pit, the Keystone Quarry, and the Neville property zoned as GU.

230

*novo* hearing was held. *Transgulf Pipeline Co. v. Board of County Commissioners*, 438 So.2d 876 (Fla. 1st DCA 1983).

3. The ultimate burden of persuasion rested upon Neville to establish its entitlement to a permit authorizing it to conduct mining and excavation activities on its land. *Graham v. Estuary Properties, Inc.*, 399 So.2d 1374 (Fla. 1981), *Florida Department of Transportation v. J.W.C. Co.*, 396 So.2d 778 (Fla. 1st DCA 1981). The proof establishes that Neville's proposal to mine and excavate its property is a non-permitted use. Accordingly, Neville has failed to demonstrate that its proposal complies with the land development regulations applicable to this case.

Based on the foregoing Findings of Fact and Conclusions of Law, it is

RECOMMENDED that the Florida Land and Water Adjudicatory Commission enter a final order reversing the decision of Monroe County, and deny Neville's application for a permit to mine and excavate its property.

DONE AND ENTERED this 5th day of September, 1986, at Tallahassee, Florida.